ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL GENERAL DE JUSTICIA
TRIBUNAL DE APELACIONES
**PANEL IV**

| | | |
|---|---|---|
| **JOSÉ C. FONSECA MIRANDA**<br>QUERELLANTE(S)-RECURRIDA(S)<br><br><br>V.<br><br><br>**IMPERIO AUTO CORP.**<br>QUERELLADA(S)-RECURRENTE(S) | **KLRA202400451** | *REVISIÓN DE DECISIÓN ADMINISTRATIVO* procedente del Departamento de Asuntos del Consumidor (DACo)<br><br>Civil Núm.:<br>**SAN-2023-0013312**<br><br>Sobre:<br>Compraventa de Vehículo de Motor |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Jueza Rivera Marchand y la Juez Barresi Ramos.

*Barresi Ramos,* juez ponente.

## S E N T E N C I A

En San Juan, Puerto Rico, hoy día 26 de marzo de 2025.

Comparece ante este Tribunal de Apelaciones, **IMPERIO AUTO CORP.** (**IMPERIO AUTO**) mediante un *Recurso de Revisión* incoado el 16 de agosto de 2024. En su escrito, solicita que revisemos la *Resolución* decretada el 11 de junio de 2024 por el **DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR (DACO)**.[1] Por medio de esta decisión administrativa, se declaró con lugar la *Querella* interpuesta el 17 de enero de 2023; se dictó la resolución total del contrato por vicios redhibitorios; y se ordenó a **IMPERIO AUTO** reembolsar la cantidad de $6,700.00 a favor del señor **JOSÉ C. FONSECA MIRANDA** (señor **FONSECA MIRANDA**) dentro del término de treinta (30) días.

Exponemos el trasfondo fáctico y procesal que acompaña a la presente controversia.

---

[1] Este dictamen administrativo fue notificado y archivado en autos el 11 junio de 2024. Apéndice de *Recurso de Revisión,* págs. 20- 32.

Número Identificador: SEN2025_____

- I -

El 20 de diciembre de 2022, el señor FONSECA MIRANDA suscribió una *Orden de Compra* para adquirir un vehículo de motor usado, marca Suzuki, modelo Vitara, color verde, del año 2006, en IMPERIO AUTO.[2] Al momento de la transacción, el odómetro del automóvil marcaba 107,563 millas. Tras varias negociaciones, el precio fue reducido y pactado en $6,700.00. Dicha cuantía fue satisfecha en su totalidad por el señor FONSECA MIRANDA.

Al salir del concesionario, IMPERIO AUTO, y luego de echarle gasolina al vehículo, se encendió la bombilla de advertencia conocida como *"check engine"*. Entonces, el señor FONSECA MIRANDA regresó al concesionario y fue coordinada una cita para el día siguiente con el mecánico de IMPERIO AUTO.

El 21 de diciembre de 2022, el señor FONSECA MIRANDA reclamó otros defectos. Los alegados desperfectos fueron: (1) el radio no funcionaba; (2) el *"cruise control"* no funcionaba; (3) la varilla de medir aceite con *"handle"* roto; (4) goteo de aceite; (5) tapa exterior al tanque de gasolina no cierra; y (6) luces delanteras opacas. Después de la inspección, el mecánico de IMPERIO AUTO notificó que el problema del *"check engine"* se debía a los catalíticos. En cuanto a los otros reclamos, se le indicó que no eran responsables de reparar en garantía toda vez que el auto fue vendido "as is" y barato. Empero, IMPERIO AUTO contrató a PLAVICA para que repararan la filtración de agua, trabajo que fue realizado el 9 de enero de 2023.

Así las cosas, el 12 de enero de 2023, el señor FONSECA MIRANDA le informó a IMPERIO AUTO que la filtración de agua no fue corregida satisfactoriamente. Se citó para la semana siguiente, pero el señor FONSECA MIRANDA no compareció.

Posteriormente, el 17 de enero de 2023, el señor FONSECA MIRANDA presentó *Querella* solicitando como remedio "que el costo de reemplazo de los catalíticos sea sufragado por el dealer" ante el DACo.[3]

---

[2] Apéndice de *Recurso de Revisión*, págs. 9- 10.
[3] *Íd.*, págs. 1- 8.

Más tarde, el 24 de mayo de 2023, a las 11:00 de la mañana, fue realizada una inspección al vehículo por el señor JOSÉ H. APONTE ORTIZ, técnico automotriz de investigación del **DACo**.[4] Para esta fecha, el odómetro del auto marcaba 109,819 millas recorridas. Se desprende del *Informe de Inspección*, un estimado de reparación de $2,707.83, incluyendo costos de piezas y labor. La valuación no incluyó piezas y/o labor para corregir la fuga de refrigerante.

El 29 de junio de 2023, el señor **FONSECA MIRANDA** presentó una *Enmienda a Querella* para reclamar, entre otras cosas, la cancelación de la compraventa del vehículo y devolución de la totalidad del dinero más gastos incurridos para el arreglo y remplazo de bombillas delanteras; varilla para medir aceite; sellador para filtración de agua; cambio de aceite; radio; beeper de alarma; y uso y consumo de coolant.[5]

Luego de varias incidencias procesales, el 15 de mayo de 2024, se celebró la vista administrativa mediante videoconferencia ante el **DACo**. El 11 de junio de 2024, se dictaminó la *Resolución* recurrida. En la aludida *Resolución*, se consignaron las siguientes determinaciones de hechos:

1. El 20 de diciembre de 2022, el Querellante suscribió una orden de compra para adquirir de la Vendedora, un vehículo de motor usado, marca *Suzuki*, modelo *Vitara*, color verde, del año 2006, con número de motor o serie (VIN) JS3TE943664104647 y tablilla GQJ-048, en adelante denominado como "el Vehículo".
2. Al momento de ser adquirido, el Vehículo marcaba en su odómetro 107,563 millas recorridas.
3. El Querellante tuvo oportunidad de examinar el Vehículo y estar dentro del mismo mientras se hacía una prueba de carretera.
4. El Querellante no llevó un técnico automotriz para que inspeccionara el Vehículo antes de adquirirlo.
5. La Vendedora no otorgó garantía al Vehículo y catalogó la venta como una "Wholesale".
6. Al final de la Orden de Compra y junto a las iniciales del Querellante consta la siguiente política de la Vendedora: "No se aceptarán devoluciones en ventas "Wholesale".
7. En los términos y condiciones de la compraventa aceptadas por el Querellante mediante sus iniciales y firma, consta lo siguiente en cuanto a las ventas catalogadas como "Wholesale":

---

[4] Apéndice de *Recurso de Revisión*, págs. 12- 15. A ese momento, el automóvil había discurrido unas **2,256 millas**.

[5] Apéndice de *Recurso de Revisión*, págs. 16- 19. Se desprende de la transcripción de la prueba oral (TPO) que el 13 de agosto de 2023 hubo una tercera enmienda a la *Querella*. TPO del 13 de agosto de 2023, pág. 16, líneas 16- 17.

Mercancía marcada "As is" y/o "Wholesale" y aceptada por el cliente no se otorgará garantía ni se negociarán devoluciones. Ventas "Wholesale" serán aceptadas como ventas al por mayor o precios de reventa y no se aceptarán devoluciones ni se otorgarán garantías.

8. Luego del Querellante negociar o "regatear, el precio pactado por el Vehículo fue de $6,700, suma que fue satisfecha por el Querellante en su totalidad.

9. No consta en la Orden de Compra, incluyendo la Hoja de Términos y Condiciones, que el Querellante hubiese renunciado o suprimido la obligación de saneamiento de la Vendedora.

10. Al salir del concesionario y luego de echarle gasolina al Vehículo, se encendió la luz de advertencia conocida como "check engine". Por ello, el Querellante regresó al concesionario y le fue coordinada una cita al siguiente día con el mecánico de esa entidad.

11. El 21 de diciembre de 2022, el mecánico de la Vendedora examinó el Vehículo e informó al Querellante que el defecto era de los catalíticos. Además, respecto a otros defectos reclamados por el Querellante en esta visita, la Vendedora respondió que el Vehículo no contaba con garantía por haberse vendido barato.

12. Esos otros defectos que el Querellante reclamó a la Vendedora, a parte de la corrección del problema de los catalíticos, fueron los siguientes: (a) radio que no funcionaba; (b) cruise control que no funcionaba ; (c) varilla de medir aceite con *handle* roto; (d) gotea aceite; (e) tapa exterior al tanque de gasolina no cierra; (f) luces delanteras opacas.

13. El 24 de diciembre de 2022, el Querellante contrató a Río Grande Lock and Sound, Inc. para que le vendiera e instalara un radio con cámara trasera para el Vehículo a un costo de $250.82. Asimismo, contrat[ó] a dicha parte para que le vendiera una copia de la llave y *beeper* para el Vehículo, a un costo de $42.37.

14. Ese mismo 24 de diciembre de 2022, el Querellante contrató a Advance Auto Parts para realizar un servicio de mantenimiento en el Vehículo para el cambio de aceite y filtro de motor, a un costo de $49.06.

15. A pesar de haber informado al Querellante que no era responsable de reparar en garantía, la Vendedora contrató a *Plavica* para que reparara la infiltración de agua, obra que fue realizada el 9 de enero de 2023.

16. El 12 de enero de 2023, el Querellante informó a la Vendedora que no fue corregido satisfactoriamente la infiltración de agua. La Vendedora citó al Querellante para la semana siguiente para reparar ese defecto, pero el Querellante no llevó el Vehículo al concesionario.

17. El 17 de enero de 2023, el Querellante radicó la presente querella, solicitando como remedio "que el costo de reemplazo de los catalíticos sea sufragado por el dealer".

18. El defecto relacionado con los catalíticos nunca fue atendido por la Vendedora en las visitas realizadas por el Querellante previo a la radicación de la querella.

19. El 24 de mayo de 2023 fue sometida por el Querellante una enmienda a los efectos de incluir una queja sobre "fuga de agua" o "consumo de agua cada uno o dos días desde la compraventa". A su vez, el Querellante solicitó: "la cancelación de la compra y venta del vehículo y la devolución en su totalidad m[á]a gastos incurridos en el mismo para el arreglo y reemplazo de bombillas delanteras, varilla para medir aceite, sellador para filtración de agua, cambio de aceite, radio, beeper de alarma y uso y consumo de coolant".

20. El mismo 24 de mayo de 2023 fue realizada una inspección del Vehículo por el Técnico Automotriz José H. Aponte Ortiz, en su capacidad de

técnico de investigación del Departamento. Para esta fecha el odómetro del Vehículo marcaba 109,819 millas recorridas.

21. Como resultado de esa inspección, el técnico Aponte Ortiz informó haber constatado las siguientes condiciones en el vehículo:

> *El vehículo presenta códigos P0420-Catalyst System Efficiency Below Threshold (Bank 1), P0430-P0430 OBD-II Trouble Code: Catalyst System Efficiency Below Threshold (Bank II).*
> *El radio del vehículo es nuevo.*
> *Las bombillas defectuosas fueron reemplazadas.*
> *La varilla indicadora de nivel en el aceite de motor es nueva.*
> *La tapa del tanque de gasolina tiene la cerradura rota.*
> *El vehículo presenta fuga de aceite de motor.*
> *El vehículo presenta fuga de refrigerante debido a la corrosión que presenta en la tubería de este sistema.*
> *El piso del lado del conductor presenta una reparación con material de corrección para hojalatería, aparenta ser "Masilla", pero todavía presenta un hueco abierto en [á]rea adyacente a la reparación.*
> *La tubería de los conductos del refrigerante se presenta corroída rota y con fuga. Se señala esto ya que es la razón por la que no se puede realizar una prueba de carretera.*
> *El beeper del vehículo es nuevo.*

22. El técnico del Departamento emitió la siguiente opinión:

Con relación a los códigos de problemas que presenta el vehículo estos reflejan que el vehículo puede tener problemas con el convertidor catalítico ya que las lecturas de los sensores antes y después del catalítico están fuera de especificaciones, también podría ser desperfecto en las bujías fuga en los inyectores, daños mecánicos en el motor, desperfectos en los sensores de oxígeno o fuga en el sistema de escape.

El sistema de cerradura que está localizado en la tapa de gasolina esta dañado y se debe remplazar para corregir el desperfecto que presenta.

La fuga de aceite de motor aparenta provenir de la junta de abajo del Carter. Para trabajar con este desperfecto es recomendable remover el motor del vehículo.

La fuga de refrigerante se encuentra dispersa por toda la parte inferior del motor, se añade este detalle debido a que esta es la razón por la cual al vehículo no se le puede realizar una prueba de carretera.

El orificio que se señala en el piso del chofer debe ser sellado para prevenir la humedad en el piso.

Lo del fallo en el "cruise control" no se pudo determinar, ya que el vehículo tendría que estar en condiciones óptimas de funcionamiento para realizar una prueba de carretera.

23. El técnico Aponte Cruz estimó en la cantidad de $2,707.83 la reparación del vehículo, incluyendo costos de piezas y labor, imprevistos e impuesto de ventas y uso. Dicho estimado no incluyó aquella[s] piezas y labor para corregir la fuga de refrigerante.

24. El Informe de Inspección suscrito por el técnico Aponte Ortiz fue notificado a las partes el 6 de junio de 2023, siendo apercibidas las partes de su derecho a objetar el mismo.

25. Las partes de epígrafe no objetaron el Informe de Inspección por lo que quedó estipulado.

26. El 13 de agosto de 2023, el Querellante solicitó enmendar su querella para reclamar la indemnización de cargos por almacenamiento del Vehículo en el taller conocido como Carolina Fuel Injection.

27. Luego de varias incidencias procesales, el 15 de mayo de 2024, fue celebrada la vista administrativa por videoconferencia para dilucidar la querella con la comparecencia de ambas partes.

28. No son vicios ocultos o redhibitorios aquellos reclamados por el Querellante en cuanto al radio, *cruise control*, varilla de medir aceite con *handle* roto y luces delanteras opacas para conducir de noche. Todos estos defectos eran aparentes y el Querellante pudo haberlos apreciado al examinar el Vehículo previo a la compraventa.

29. Son vicios redhibitorios los defectos constatados por el Inspector del Departamento, que se detallan a continuación:

Problemas con el convertidor catalítico, sensores de oxígeno y sistema de escape.

Sistema de cerradura en la tapa de gasolina.

Fuga de aceite de motor por la Junta del cárter *oil pan*.

Fuga de refrigerante por la parte inferior del motor.

Orificio en el piso del lado del conductor que causa infiltración de agua.[6]

Inconforme, el 16 de agosto de 2024, **IMPERIO AUTO** entabló ante este Tribunal intermedio un *Recurso de Revisión*. En el mismo, señala el(los) siguiente(s) error(es):

Erró el DACo al determinar que[,] no obstante el recurrido haber consentido a que el vehículo fue vendido *sin garantía*, como *venta wholesale, "as is" "comerciante a comerciante"*, ello no constituye una renuncia consciente e informada a su derecho de saneamiento por vicios redhibitorios bajo el Código Civil de Puerto Rico.

Erró el DACo al determinar que la parte recurrida dio oportunidad a la vendedora de reparar el vehículo antes de reclamar ante DACo y aplicar la opción de la Resolución del Contrato cuando los defectos expuestos en el Informe de Inspección fueron posteriores a la presentación de la Querella.

El 21 de agosto de 2024, intimamos *Resolución* en la cual, entre otras cosas, concedimos un plazo perentorio de treinta (30) días para presentar su(s) alegato(s) en oposición al señor **FONSECA MIRANDA**. Efectivamente, el 25 de septiembre de 2024, el señor **FONSECA MIRANDA** presentó su escrito intitulado *Alegato en Oposición a Recurso de Revisión Judicial*. Puntualizó que la apreciación de la prueba establecida en la resolución de la agencia debe sostenerse debido a que la unidad adquirida no cumplió con los elementos básicos para ser vendida.

---

[6] Apéndice de *Recurso de Revisión*, págs. 20- 24.

Evaluado concienzudamente el expediente del caso, habiéndole dado la debida consideración a la transcripción de la prueba oral (TPO) estipulada y contando con el beneficio de la comparecencia de todas las partes, nos encontramos en posición de adjudicar. Puntualizamos las normas de derecho pertinentes a la(s) controversia(s) planteada(s).

- II -

- A - *REVISIÓN JUDICIAL*

La *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico* (LPAU) provee un cuerpo de reglas mínimas para gobernar los procesos de adjudicación y reglamentación en la administración pública.[7] Su sección 4.1 instituye la *revisión judicial* por este Tribunal de Apelaciones de las determinaciones finales de las agencias.[8]

La *revisión judicial* tiene como propósito limitar la discreción de las agencias y asegurarse de que estas desempeñen sus funciones conforme a la ley.[9] El criterio rector al momento de pasar juicio sobre una decisión de un foro administrativo es la *razonabilidad* de la actuación de la agencia.[10] Nuestra evaluación de la decisión de una agencia se circunscribe, entonces, a determinar si esta actuó de forma arbitraria, ilegal o irrazonable, o si sus acciones constituyen un abuso de discreción.[11]

Empero, las decisiones de los organismos administrativos especializados gozan de una presunción de legalidad y corrección, por lo que, sus conclusiones e interpretaciones merecen gran consideración y respeto.[12] Por ello, al ejecutar nuestra función revisora, este Tribunal está obligado a considerar la especialización y experiencia de la agencia, distinguiendo entre cuestiones de

---

[7] Conocida como la Ley Núm. 38 de 30 de junio de 2017, según enmendada, 3 LPRA § 9601-9713; *SLG Saldaña-Saldaña v. Junta*, 201 DPR 615, 621 (2018).

[8] 3 LPRA § 9671.

[9] *Torres v. Junta Ingenieros*, 161 DPR 696, 707 (2004). Véase, además Javier A. Echevarría Vargas, *Derecho Administrativo Puertorriqueño*, Ediciones Situm (2017), págs. 304– 306.

[10] *Fonte Elizondo v. F & R Const.*, 196 DPR 353 (2016); *Otero v. Toyota*, 163 DPR 716 (2005). D. Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, 2da ed., Bogotá, Ed. Forum, 2001, pág. 543.

[11] *Pérez López v. Depto. Corrección*, 208 DPR 656, 660 (2022).

[12] *Transporte Sonnell, LLC v. Junta de Subastas*, 2024 TSPR 82; 214 DPR ____; *Torres Rivera v. Policía de PR*, 196 DPR 606, 625- 626 (2016); *García Reyes v. Cruz Auto Corp.*, 173 DPR 870, 891 (2008).

interpretación estatutaria —sobre las que los tribunales son especialistas— y cuestiones propias de la discreción o pericia administrativa.[13] Ello implica que los dictámenes de los entes administrativos merecen deferencia judicial.[14]

Ahora bien, tal norma no es absoluta. Nuestro más alto foro ha instaurado que no podemos dar deferencia a las determinaciones administrativas que sean irrazonables, ilegales o contrarias a derecho.[15] Particularmente, concretó las normas básicas sobre el alcance de la *revisión judicial* al expresar:

> [L]os tribunales deben dar deferencia a las decisiones de una agencia administrativa, pero ésta cederá cuando: (1) la determinación administrativa no está basada en evidencia sustancial; (2) el ente administrativo erró en la aplicación o interpretación de las leyes o reglamentos que se le ha encomendado administrar; (3) el organismo administrativo actuó arbitraria, irrazonable o ilegalmente, realizando determinaciones carentes de una base racional, o (4) la actuación administrativa lesionó derechos constitucionales fundamentales. Es importante destacar que, si el tribunal no se encuentra frente a alguna de esas situaciones, aunque exista más de una interpretación razonable de los hechos procede que se valide la interpretación que realizó la agencia administrativa recurrida.

Primordialmente, el alcance de la *revisión judicial* de las determinaciones administrativas se ciñe a determinar lo siguiente: (1) si el remedio concedido por la agencia fue el apropiado; (2) si las determinaciones de hecho de la agencia están basadas en *evidencia sustancial* que obra en el expediente administrativo, y (3) si las conclusiones de derecho fueron las correctas.[16]

En cuanto a las determinaciones de hechos, estas serán sostenidas por los tribunales si están respaldadas por *evidencia sustancial* que surja del expediente administrativo considerado en su totalidad.[17] La *evidencia sustancial* es aquella relevante que una mente razonable puede aceptar como adecuada para sostener una conclusión.[18] Debido a la presunción de regularidad y corrección que cobija a las decisiones de las agencias administrativas, quien alegue ausencia de *evidencia sustancial* debe presentar prueba suficiente para derrotar dicha presunción.[19] Para ello "tiene que demostrar que existe otra prueba en el expediente que reduzca o

---

[13] *OCS v. Point Guard Ins.*, 205 DPR 1005, 1028 (2020).
[14] *DACo v. Toys "R" Us*, 191 DPR 760, 765 (2014).
[15] *Torres Rivera v. Policía de PR, supra.*
[16] Sección 4.5 de la LPAU, 3 LPRA § 9675; *OEG v. Martínez Giraud,* 210 DPR 79 (2022).
[17] *Rolón Martínez v. Supte. Policía,* 201 DPR 26, 36 (2018).
[18] *Otero v. Toyota, supra*, pág. 728.
[19] *Graciani Rodríguez v. Garaje Isla Verde*, 202 DPR 117, 128 (2019).

menoscabe el valor probatorio de la evidencia impugnada, hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración".[20] De modo que no podrá basarse únicamente en simple alegaciones. A esto se le conoce como la norma de la *evidencia sustancial,* con la cual se persigue evitar sustituir el criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor.[21] Por lo tanto, aun cuando exista más de una interpretación razonable de los hechos, el tribunal debe dar deferencia a la agencia, y no sustituir su criterio por el de esta.[22]

De otro lado, las conclusiones de derecho de la agencia son revisables en todos sus aspectos, sin sujeción a norma o criterio alguno.[23] Así, debemos dar deferencia a las interpretaciones que los organismos administrativos hacen de las leyes y reglamentos que administran. Es por ello que, ante casos dudosos, donde pueda concebirse una interpretación distinta de estas leyes y reglamentos, la determinación de la agencia merece deferencia sustancial.[24]

En resumen, si la decisión recurrida es razonable y se sostiene en la *evidencia sustancial* que obra en el expediente administrativo, procede su confirmación.[25] A *contrario sensu,* los tribunales revisores podemos intervenir con la decisión recurrida cuando no está basada en *evidencia sustancial,* o cuando la actuación es arbitraria, irrazonable o ilegal, o cuando afecta derechos fundamentales.[26] Del mismo modo, el Prof. Echevarría Vargas ha apuntalado que las decisiones de las agencias gubernamentales no deben ser "revocadas o modificadas salvo que conste una actuación arbitraria, ilegal o irrazonable".[27]

---

[20] *Gutiérrez Vázquez v. Hernández y otros,* 172 DPR 232, 244 (2007).
[21] *Pacheco v. Estancias,* 160 DPR 409, 432 (2003).
[22] *Íd.*
[23] *Rebollo v. Yiyi Motors,* 161 DPR 69, 77 (2004).
[24] *Torres Santiago v. Depto. Justicia,* 181 DPR 969, 1002 (2011).
[25] *García Reyes v. Cruz Auto Corp., supra,* pág. 893.
[26] *Capó Cruz v. Jta. Planificación et al.,* 204 DPR 581 (2020); *JP, Plaza Santa Isabel v. Cordero Badillo,* 177 DPR 177 (2009).
[27] Echevarría Vargas, J. A., *Derecho Administrativo Puertorriqueño,* 5ta. ed. Rev., San Juan, Ed. Situm, 2023, pág. 340.

### - B - *Departamento de Asuntos del Consumidor (DACo)*

La *Ley Orgánica del Departamento de Asuntos del Consumidor* creó al **DACo** como la agencia administrativa encargada de proteger y salvaguardar los derechos del consumidor.[28] En consecuencia, se implantó una estructura de adjudicación administrativa con plenos poderes para resolver las controversias ante su consideración y concesión de los remedios pertinentes conforme a derecho.[29] De esta forma, la Asamblea Legislativa le adjudicó la responsabilidad de velar por el cumplimiento de todas las leyes concernientes a los derechos de los consumidores.[30] Como parte del cumplimiento con su misión, se le facultó al secretario del **DACo** la promulgación del *Reglamento de Procedimientos Adjudicativos*.[31] Su propósito principal es "asegurar la solución justa, rápida y económica de las querellas presentadas ante o por el Departamento y proveer un procedimiento uniforme para su adjudicación".[32]

A este tenor, el secretario del **DACo** creó el *Reglamento de Garantías de Vehículos de Motor* (*Reglamento*).[33] Este *Reglamento* rige la venta y/o servicios de vehículos de motor nuevos o usados en Puerto Rico. Uno de los propósitos principales de esta reglamentación es proteger a los consumidores que invierten en la adquisición de automóviles, y procurar que estos sirvan para los propósitos para los cuales fueron adquiridos, y tengan las condiciones mínimas necesarias para garantizar la protección de la vida y propiedad.[34]

En cuanto a la garantía de los vehículos de motor usados, la Regla 26 del aludido *Reglamento* enuncia:

> Regla 26: Vehículos de Motor Usados
> 26.1 – Se prohíbe vender un vehículo de motor usado sin garantía.
> 26.2 – Todo vendedor de vehículos de motor usados, concederá garantía, en piezas y mano de obra. Esta garantía será a base del millaje recorrido y según la siguiente escala:

---

[28] Ley Núm. 5 del 23 de abril de 1973, según enmendada. 3 LPRA § 341b *et seq.*
[29] 3 LPRA § 342 e(d); *Ortiz Rolón v. Armando Soler Auto Sales, Inc.*, 202 DPR 689, 696 (2019).
[30] *Íd.*
[31] *Reglamento* Núm. 8034, Departamento de Asuntos del Consumidor. (Aprobado el 14 de junio de 2011).
[32] *Reglamento* Núm. 8034, Departamento de Asuntos del Consumidor. (Aprobado 13 de junio de 2011), pág. 1.
[33] *Reglamento* Núm. 7159, Departamento de Asuntos del Consumidor. (Aprobado 1 de junio de 2006), pág. 2.
[34] *Íd.*, págs. 1- 2.

a) Hasta 36,000 millas – cuatro (4) meses o cuatro mil (4,000) millas, lo que ocurra primero.
b) Más de 36,000 millas y hasta 50,000 millas- tres (3) meses o tres mil (3,000) millas, lo que ocurra primero.
**c) Más de 50,000 millas y hasta 100,000 millas – dos (2) meses o dos mil (2,000) millas, lo que ocurra primero.**[35]
26.3 – El comprador tendrá derecho a que la unidad sea inspeccionada por un mecánico de su preferencia, antes de comprar el vehículo usado.

En lo pertinente, la Regla 29.3 del citado *Reglamento* 7159 prescribe las obligaciones del vendedor al proveer servicio de reparación en garantía a un vehículo de motor usado. Sobre la reparación de defectos, dispone que:

El Departamento, **podrá a opción del consumidor, decretar la resolución del contrato o reducir proporcionalmente su precio de venta de acuerdo a las disposiciones del Código Civil de Puerto Rico** en aquellos casos en que el vendedor o su representante, dentro de los términos de la garantía, tuvo **oportunidad razonable** para reparar uno o más defectos, pero no quiso o no pudo corregirlos. Lo que constituye oportunidad razonable de reparar se determinará tomando en consideración las circunstancias particulares de cada caso. (Énfasis nuestro).[36]

El *Reglamento* Núm. 7159 hace la salvedad de que ninguna disposición de este, limitará el derecho del consumidor para ejercer cualquier acción reconocida en las leyes de nuestro ordenamiento, así como aquellas sobre saneamiento por vicios ocultos o redhibitoria y otras reconocidas en el Código Civil de Puerto Rico.[37]

### - C - VICIO REDHIBITORIO Y SANEAMIENTO

En nuestro ordenamiento jurídico, todo vendedor está obligado a la entrega y saneamiento de la cosa objeto de la venta, aunque ignorase los defectos ocultos.[38] Lo cual conlleva que el vendedor tenga la obligación de garantizar al comprador la posesión pacífica y útil de la cosa vendida y a su vez, responder por los vicios o defectos ocultos que tuviere.[39] El adquirente puede optar por reclamar la subsanación o reparación de los defectos, la entrega de un bien equivalente o resolver total o parcialmente el contrato.[40] Para que proceda una acción de saneamiento por vicios ocultos, el Máximo Foro ha establecido que deben estar

---

[35] *Íd.*, págs. 25- 26. (énfasis nuestro).
[36] *Íd.*, págs. 29- 30. *Ortiz Rolón v. Armando Soler Auto Sales, Inc., supra.* El Código Civil de Puerto Rico de 2020 establece que la resolución total (del contrato) **solo procede** si la evicción o el defecto (de la cosa) recaen sobre un aspecto determinante para la adquisición del bien. Por ejemplo, en caso de evicción, el comprador también tendría derecho al resarcimiento de daños sufridos, salvo que haya actuado con negligencia. Refiérase: 31 LPRA § 9853. (énfasis nuestro).
[37] *Íd.*, a la pág. 35.
[38] Art. 1261 del Código Civil de Puerto Rico de 2020, 31 LPRA § 9851.
[39] Art. 1263 del Código Civil de Puerto Rico de 2020, 31 LPRA § 9853.
[40] *Íd.*

presente los siguientes requisitos: (1) el defecto de la cosa vendida no sea de conocimiento del adquirente; (2) dicha imperfección sea grave o suficientemente importante que haga que la cosa sea impropia para el uso que se le destinó; (3) dicho desperfecto sea preexistente a la venta; y (4) se ejercite la acción en el plazo legal de seis (6) meses contados desde la entrega de la cosa vendida.[41]

Cónsono con lo anterior, en *Ford Motor Co. v. Benet*, nuestro más Alto Foro sostuvo que procede una acción redhibitoria por vicios ocultos en vehículos de motor defectuosos, cuando el "...comprador logra probar que el automóvil que compró no funcionaba en forma normal y que el vendedor tuvo oportunidad de corregir los defectos y no pudo o no los corrigió".[42]

En cuanto a la revisión sobre la apreciación de la importancia del defecto por el foro inferior, nuestro Tribunal Supremo reiteró que:

> [L]a apreciación de la importancia del defecto, para resolver la procedencia de la acción redhibitoria, es esencialmente una cuestión de hecho, justificándose, por lo tanto, **nuestra intervención con la discreción del juzgador sólo en aquellos casos que acusen una ausencia de prueba adecuada o la comisión de error manifiesto en su apreciación**.[43]

En ese contexto, un vicio redhibitorio se define como "el defecto oculto en el bien transmitido a título oneroso, existente al tiempo de la adquisición, que hace impropio al bien para su destino o disminuye de tal modo su utilidad que, de haberla conocido, el adquirente no le habría dado menor por él".[44] Al mismo tiempo, el ordenamiento jurídico considera también un vicio redhibitorio: (a) aquel especialmente acordado como tal por las partes; (b) aquel que el transmitente garantiza que no existe; y (c) la ausencia de calidad convenida. En ese sentido, el transmitente responderá, aunque ignore la existencia del vicio redhibitorio.[45]

---

[41] *García Reyes v. Cruz Auto Corp.*, 173 DPR 870, 890-891 (2008). En reiteradas ocasiones, el Tribunal Supremo de Puerto Rico ha resuelto que dicho plazo "comienza a transcurrir no desde la fecha de perfección del contrato, sino desde el momento que cesan las gestiones de inteligencia entre las partes". *Polanco v. Cacique Motors*, 165 DPR 156, 166 [citando a *Ferrer v. General Motors*, 100 DPR 246,256 (1971); *Casa Jaime Corp. v. Castro,* 89 DPR 702 (1963)].

[42] 106 DPR 232, 238 (1977). (énfasis nuestro). Reiterado en *Polanco v. Cacique Motors, supra,* pág. 168.

[43] *García Reyes v. Cruz Auto Corp., supra.* [Citando a *García Rivera v. Ciudad Chevrolet, Inc.*, 110 DPR 158,162 (1980); *DACO v. Marcelino Mercury, Inc.*, 105 DPR 80,84 (1976)]. (énfasis nuestro).

[44] Art. 1267 del Código Civil de Puerto Rico de 2020, 31 LPRA § 9871.

[45] *Íd*. (énfasis nuestro).

Ahora bien, si por el contrario el defecto de la cosa no es de tal magnitud como para mermar su utilidad o habilitar la garantía por vicios redhibitorios, puede subsanarse mediante la doctrina del error. Es decir, en ese escenario, las partes podrían extender el concepto de defectos ocultos mediante pacto y subsanarlo.[46]

## - III -

**IMPERIO AUTO** apuntaló que erró **DACO** al determinar que pese a que el auto fue vendido sin garantía como venta "wholesale" "as is" y "comerciante a comerciante" ello no constituye una renuncia consiente e informada a su derecho de saneamiento por vicios redhibitorios; y al determinar que el señor **FONSECA MIRANDA** dio oportunidad para reparar el vehículo antes de acudir ante el **DACO** y aplicar la opción de resolución del contrato cuando los defectos expuestos en el *Informe de Inspección* son posteriores a la presentación a la *Querella*.[47]

El señor **FONSECA MIRANDA** planteó que los desperfectos, que no eran detectables, impedían el uso del vehículo y los mismos le eran desconocidos por completo.

Justipreciada la *Transcripción de la Prueba Oral* (TPO) de la audiencia celebrada el 15 de mayo de 2024, el señor **FONSECA MIRANDA** atestiguó que el día que adquirió el vehículo la luz del "*engine*" se encendió.[48] En específico, aseveró que el señor Juan Alvira Cintrón, su amigo, le ayudó para hacer la transacción; fueron al *dealer;* regatearon el precio; y éste estuvo lidiando con el costo y todo.[49] Declaró que vieron la guagua en el lote del concesionario de **IMPERIO AUTO**, e hicieron una prueba de carretera alrededor del bloque.[50] Estuvo dentro del automóvil; hizo una inspección visual y vio el millaje.[51] Reconoció que el precio

---

[46] Refiérase: Miguel R. Garay: *Memorial Explicativo; Código Civil de Puerto Rico 2020 y su historial legislativo*, Ediciones SITUM., pág. 930 (2020).

[47] El anterior *Reglamento de Garantías de Vehículos de Motor* definía "as is" como "usted está comprando un automóvil exactamente en las condiciones que lo ve. El vehículo será vendido sin garantía alguna y usted corre el riesgo de tener que pagar la reparación de los defectos que tenga".

[48] Véase, TPO del 13 de agosto de 2023, pág. 17, líneas 1- 2.

[49] Véase, TPO del 13 de agosto de 2023, pág. 17, líneas 8- 12 y 22- 24.

[50] Véase, TPO del 13 de agosto de 2023, pág. 18, líneas 13- 24.

[51] Véase, TPO del 13 de agosto de 2023, pág. 19, líneas 6- 15.

acordado fue $6,700.00.[52] Así como, examinó el documento enumerado 3516 y titulado "Términos y Condiciones del Contrato de Compra Venta" en los cuales confirmó que tienen sus iniciales y firma.[53] Efectuado el pago, salió del concesionario IMPERIO AUTO y fue a echarle gasolina al automóvil. Al encender, prendió la luz de *check engine*.[54] El señor FONSECA MIRANDA explicó que regresó a IMPERIO AUTO, habló con el señor Roberto Rivera; se le citó para el día siguiente y se marchó en su auto.[55]

Manifestó que cuando llegó al otro día, no apareció ninguna de las personas administrativas; dialogó con el mecánico quien le dijo que eran los catalíticos, pero no hicieron reparación alguna.[56] Regresó el próximo día e IMPERIO AUTO realizó ciertas reparaciones.[57] IMPERIO AUTO atendió las reclamaciones del liqueo del agua en el lado del conductor y cambio de las luces delanteras. Aclaró que no llevó su automóvil a algún otro taller.[58]

En el contrainterrogatorio, el señor FONSECA MIRANDA precisó que antes de iniciar y firmar los documentos leyó su contenido.[59] Reafirmó que inspeccionaron el carro dentro de las facilidades de IMPERIO AUTO.[60] Corroboró, además, que aceptó las condiciones establecidas en el contrato de compraventa.[61]

A la luz de lo anterior, **DACO** emitió su decisión y determinó que el señor FONSECA MIRANDA demostró que el "automóvil que compró no funciona normalmente y que [IMPERIO AUTO] tuvo oportunidad de corregir el defecto, pero no lo corrigió o no pudo corregirlo. [IMPERIO AUTO] no quedó exenta de su obligación de reparar los vicios redhibitorios al momento de contratar y dicha parte no presentó prueba de que el funcionamiento anormal fuese causado por actos del [señor FONSECA MIRANDA] [...] El técnico del Departamento constató los

---

[52] Véase, TPO del 13 de agosto de 2023, pág. 20, líneas 12- 16. Las partes acordaron que no había controversia en cuanto al pago. TPO del 13 de agosto de 2023, pág. 20, líneas 18- 21.
[53] Véase, TPO del 13 de agosto de 2023, pág. 19, línea 17; pág. 21, línea 20; y pág. 23, líneas 1- 22.
[54] Véase, TPO del 13 de agosto de 2023, pág. 25, líneas 4- 21.
[55] Véase, TPO del 13 de agosto de 2023, pág. 26, líneas 2- 21.
[56] Véase, TPO del 13 de agosto de 2023, pág. 26, línea 25- pág. 27, línea 13.
[57] Véase, TPO del 13 de agosto de 2023, pág. 27, línea 24- pág. 29, línea 12.
[58] Véase, TPO del 13 de agosto de 2023, pág. 31, líneas 12- 15.
[59] Véase, TPO del 13 de agosto de 2023, pág. 41, líneas 15- 23.
[60] Véase, TPO del 13 de agosto de 2023, pág. 47, líneas 18- 22.
[61] Véase, TPO del 13 de agosto de 2023, pág. 51, líneas 8- pág. 52, línea 1.

defectos y ninguna de las partes objetó su informe pericial, por lo que quedó estipulado en su totalidad. De ese informe **surge que los defectos son de tal gravedad que hacen impropio al bien para su destino y disminuyen su utilidad**" [énfasis nuestro].

Por estar íntimamente relacionados, discutiremos los señalamientos de error en conjunto. En conformidad con la jurisprudencia, el señor FONSECA MIRANDA sólo está obligado a demostrar que, al momento de la compraventa, el vehículo de motor funcionaba normalmente, e IMPERIO AUTO no quiso o no pudo corregir el o los defectos a pesar de haber tenido la oportunidad de hacerlo.[62] Veamos.

Por tratarse de una interpretación de la ley, las conclusiones de derecho de una agencia son revisables en su totalidad por este tribunal. En consecuencia, colegimos que el fallo del **DACo** al interpretar la ley que le corresponde implementar no fue razonable. Son hechos incontrovertidos que: (1) el *Informe de Inspección* del **DACo** fue notificado el 6 de junio de 2023; (2) las partes **no** objetaron dicho *Informe de Inspección* dentro del plazo de quince (15) días; (3) en conformidad con la Regla 15.3 del *Reglamento de Procedimientos Administrativos* del DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR (DACO), Reglamento 8034 de 14 de junio de 2011, "si no se presentaran objeciones al informe, dentro del término de quince (15) días, **se considerará estipulado por las partes relevando la presencia del investigador en la vista administrativa**"; y (4) el aludido *Informe de Inspección* **no** comprueba que "los defectos son de tal gravedad que hacen impropio al bien para su destino y disminuyen su utilidad".

El *Informe de Inspección* contiene un estimado del costo de la reparación del automóvil. Ello pese a que no se realizó prueba de carretera. Tampoco se hizo alusión alguna a que el vehículo de motor no pudo ser conducido o manejado hasta

---

[62] *Polanco v Cacique Motors, supra,* reitera que "el comprador de un vehículo de motor – sea este nuevo o usado – al reclamar por vicios ocultos solo vendrá obligado a demostrar que el automóvil funcionaba normalmente al momento de la compra y que el vendedor no quiso o no pudo corregir el defecto, a pesar de haber tenido la oportunidad de hacerlo. (énfasis nuestro).

el lugar donde se realizó la inspección. Lo cual implica que el mismo no era inservible.[63]

Por otro lado, el auto no está cobijado bajo las disposiciones del *Reglamento* toda vez que excede el millaje contemplado en la Regla 26 y el señor FONSECA MIRANDA firmó el contrato de compraventa renunciando expresamente su derecho a reclamar garantía bajo la reglamentación del **DACo.**

Escudriñado minuciosamente el expediente, la *Transcripción de la Prueba Oral* (TPO) de la audiencia celebrada el 15 de mayo de 2024 y la evidencia desfilada marcada como exhibit, hayamos necesario intervenir con la *Resolución* de la cual se recurre. Denotamos la existencia de suficientes elementos que nos llevan a concluir que esta decisión administrativa no está sustentada y/o avalada por *evidencia sustancial* del expediente administrativo. Aún cuando el señor FONSECA MIRANDA podría tener una reclamación sobre saneamiento por vicios ocultos e IMPERIO AUTO la obligación de sanear el objeto vendido al amparo del Código Civil de Puerto Rico de 2020, su testimonio y el *Informe de Inspección* no evidenciaron que los defectos del vehículo de motor fuesen de tal magnitud que imposibilitan casi totalmente el uso del mismo y/o merman su valor, o de haberlos conocidos no lo hubiese adquirido.

Por lo cual, discernimos que la agencia incidió en los errores y no debió decretarse la resolución del contrato de compraventa del vehículo de motor.

---

[63] La opinión del señor Aponte Ortiz, técnico de investigación manifiesta: "Con relación a los códigos de problemas que presenta el vehículo estos reflejan que el vehículo puede tener problemas con el convertidor catalítico ya que las lecturas de los sensores antes y después del catalítico están fuera de especificaciones, también podría ser desperfecto en las bujías fuga en los inyectores, daños mecánicos en el motor, desperfectos en los sensores de oxígeno o fuga en el sistema de escape. El sistema de cerradura que está localizado en la tapa de gasolina esta dañado y se debe remplazar para corregir el desperfecto que presenta. La fuga de aceite de motor aparenta provenir de la junta de abajo del Carter. Para trabajar con este desperfecto es recomendable remover el motor del vehículo. La fuga de refrigerante se encuentra dispersa por toda la parte inferior del motor, se añade este detalle debido a que esta es la razón por la cual al vehículo no se le puede realizar una prueba de carretera. El orificio que se señala en el piso del chofer debe ser sellado para prevenir la humedad en el piso. Lo del fallo en el "cruise control" no se pudo determinar, ya que el vehículo tendría que estar en condiciones óptimas de funcionamiento para realizar una prueba de carretera". Por ende, **no** se desprende del *Informe de Inspección* que estos defectos son de tal gravedad que hacen impropio el bien para su destino, disminuyen su utilidad o lo hacen inservible.

## - IV –

Por los fundamentos antes expuestos, ***revocamos*** la *Resolución* dispuesta el 13 de junio de 2024 por **DACO**; y ***desestimamos*** la *Querella* interpuesta el 17 de enero de 2023 por el señor **FONSECA MIRANDA**.

**Notifíquese inmediatamente.**

Lo acordó el Tribunal y lo certifica la Secretaría del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones